IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| HARPAL S. MANGAT, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> AMICA MUTUAL INSURANCE COMPANY, <br><br> *Defendant*. | No. 24-cv-0709-ABA |

**MEMORANDUM OPINION**

This insurance dispute arises from a fire in 2019 at the home of Dr. Harpal Mangat and Dr. Harminder Kaur, plaintiffs here. After the fire damaged their house, Plaintiffs and their insurer Amica Mutual Insurance Company ("Amica") disagreed over the amounts the homeowners' policy covered. The parties relied on an appraisal panel to resolve their disputes, but two disputes linger: whether unanticipated asbestos remediation is covered under "Coverage A–Dwelling" after the appraisal award and whether expenses for cleaning and storage under "Coverage C–Personal Property" should have been paid by Plaintiffs or Amica. Those two disputes are now before the Court, the Coverage A dispute in the form of cross-motions for summary judgment and the Coverage C dispute in the form of a motion to enforce an appraisal award. For the following reasons, the Court will deny Plaintiffs' motion to enforce the arbitration award, deny Plaintiffs' motion for summary judgment, and grant Amica's motion for summary judgment.

## I. Background[1]

On November 16, 2019, Plaintiffs' home in Potomac, Maryland, caught fire after their son threw away a cigarette in a plastic bin in the basement bedroom. *See* ECF No. 24-1 at 5; ECF No. 25-7 at 10. The fire caused hundreds of thousands of dollars in damage to Plaintiffs' home and personal property, in addition to myriad remedial measures, all costly. *See, e.g.*, ECF No. 21-8 at 2 (estimating total damages over $850,000).

### A. The Policies, and the Fire

Plaintiffs had insured their home against fire loss under a policy with Amica. ECF No. 24-1 at 5–6; *see generally* ECF No. 24-12 (homeowners' policy for the relevant period). In the event of a fire loss, Amica had to pay Plaintiffs the least of either the replacement cost or the repair cost of their damaged property. *See* ECF No. 24-12 at 80. The policy also imposed certain duties on Plaintiffs for when losses occurred. *Id.* at 49 (listing "Duties After Loss"). Among those duties are the duties to "[p]rotect the property from further damage"; to "[k]eep an accurate record of repair expenses"; to "[c]ooperate with [Amica] in the investigation of a claim"; to "[s]how the damaged property" "[a]s often as [Amica] reasonably require[d]"; and to "[s]end to [Amica], within 60 days after [its] request, [Plaintiffs'] signed, sworn proof of loss." *Id.* Under Plaintiffs' policy, if they failed in their duties and that failure prejudiced Amica, Amica had "no duty to

---

[1] In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014). Because there are cross motions for summary judgment, this section incorporates facts from both parties, but the Court applies this standard separately to each motion. *See Monumental Paving & Excavating, Inc. v. Penn. Mfrs.' Ass'n. Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

provide coverage." *Id.* Likewise, the policy commits policyholders to "full compliance with all of the terms under Section I of this policy," which includes these duties. *Id.* at 51. Otherwise, Plaintiffs agreed in their policy that "[n]o action c[ould] be brought against [Amica]." *Id.*

Soon after the fire, Plaintiffs reported their losses to Amica, and Amica began inspecting and valuing the damages. *See, e.g.*, ECF No. 25-7 at 10–12 (showing that Amica had retained Environmental Solutions, Inc., to inspect the damaged property, which it did on December 20, 2019, and again, at Plaintiffs' request, on February 4, 2020). Amica determined an amount of loss to the house, covered by the policy under Coverage A–Dwelling (covering, as its name implies, "[t]he dwelling on the residence premises," ECF No. 24-12 at 38). *See* ECF No. 25-5 at 1; ECF No. 25-7 at 12. Plaintiffs disagreed with that amount and, on May 25, 2020, demanded an appraisal to resolve the disagreement. *See id.*; ECF No. 24-1 at 6; ECF No. 25-5 at 1 ("The insured is demanding appraisal between the estimate from [their contractor] of $205,881.96 and [Amica's contractor's] estimate of $75,585.84."); *compare* ECF No. 26-2 at 43 (summary of estimate by Plaintiffs' contractor)*, with* ECF No. 26-3 at 53 (summary of estimate by Amica's contractor). Plaintiffs also disagreed with the award amounts for Coverage C–Personal Property (covering "personal property owned or used by an insured," ECF No. 24-12 at 38) and Coverage D–Loss of Use (covering "any necessary increase in living expenses incurred by [Plaintiffs] so that [their] household can maintain its normal standard of living . . . . for the shortest time required to repair or replace the damage," ECF No. 24-12 at 40), demanding appraisal for each.

According to the policy, after one party demands an appraisal, each party must name an appraiser "within 20 days." ECF No. 24-12 at 66 (homeowners' policy on

3

appraisal). The two appraisers choose a third appraiser. *Id*. Together, the three appraisers form the appraisal panel. The panel assesses the facts as presented by the parties and determines an award amount for each type of coverage. *See id*.

After Plaintiffs demanded an appraisal, Amica asked them whom they chose as their appraiser. *See* ECF No. 25-7 at 15. Plaintiffs did not answer by the 20-day deadline on June 14, 2020. *See id*. So Amica extended the deadline to July 22, 2020. *See id*. Yet Plaintiffs still did not answer by the extended deadline. *See id*. Amica extended it again, this time until August 31, 2020, *id*., but again, no response. *See* ECF No. 25-7 at 20–21 (Amica letter dated September 2, 2020, noting it had previously written on July 1, July 9, July 15, August 3, and August 24, 2020, and giving another extension until September 11, 2020, as a "customer courtesy"). This pattern repeated until Amica eventually extended the reporting deadline to December 31, 2020. *See* ECF No. 25-7 at 30.

Concurrently, Amica repeatedly requested that Plaintiffs send a sworn proof of loss for Coverage A–Dwelling and Coverage C–Personal Property. *See* ECF No. 25-7 at 5, 15, 19, 21, 26, 30. The policy required Plaintiffs to submit sworn proof of loss within 60 days of Amica's request. ECF No. 24-12 at 49. Despite the repeated extensions, Plaintiffs did not do so until March 25, 2021. ECF No. 22-17. And that one-page proof of loss was inadequate. It did not meet the policy's requirements by, for example, listing "THE WHOLE LOSS AND DAMAGE" as "Yet to be determined," rather than naming a figure. *Id*. Amica, thus, rejected Plaintiffs' proof of loss. *See* ECF No. 22-18 at 2–3.

As for the appraiser, Plaintiffs did not name one until June 22, 2022, more than two years after the policy-provided deadline. *See* ECF No. 25-6 at 1. On June 24, 2022, both parties' appraisers agreed to "set with strict impartiality in the making an appraisement and estimate of the Replacement Cost and Replacement Cost Loss and Damage

4

upon the property." ECF No. 26-9 at 3. The two appraisers named a third appraiser by the end of July. *See id.* The appraisal panel was set. It would eventually determine the amount of four losses under the homeowners' policy: one loss under Coverage A–Dwelling; two losses under Coverage C–Personal Property; and one loss under Coverage D–Loss of Use. Only two losses are still at issue: the loss under Coverage A for the dwelling, and one of the losses under Coverage C for Plaintiffs' personal property damaged during the fire.

### B. The Appraisal Award for Coverage A–Dwelling

On August 10, 2022, the panel issued its first decision, "the amount of loss" under Coverage A–Dwelling. ECF No. 24-15 at 2; *see also* ECF No. 24-12 at 49 (the policy noting that property losses under Coverage A are settled at the home's "replacement cost without deduction for depreciation"). The panel found the "agreed upon . . . whole amount[ of loss] before deductions" to be $241,233.61 in replacement cost value. ECF No. 24-15 at 2; *see also* ECF No. 24-12 at 66 ("A decision agreed to by any two [members of the panel] set[s] the amount of loss."). Plaintiffs accepted Amica's payment of $122,873.41, the amount of the appraisal award minus certain previous payments that Amica had made, payments that Amica deemed under Coverage A. *See* ECF No. 22-3 at 2. In total, Amica paid, by its calculation, $241,233.61 under Coverage A for damage to the dwelling.

On December 11, 2024, about two-and-a-half years after Amica paid Plaintiffs to rebuild their fire-damaged house, Plaintiffs raised a new issue through their appraiser, Mike Hall. Hall notified Amica's appraiser, Michelle Bramucci, that during the home restoration "[a]sbestos was detected in the lower level of the floor tile under the carpet." ECF No. 24-5 at 2. Hall told Bramucci that "[i]t must be abated" and asked, "Can we

5

reopen the claim and get a supplemental estimate for such?" *Id.* (cleaned up). Abating the asbestos in the flooring cost approximately $12,000. *See* ECF No. 24-3 at 2. Hall pointed out to Bramucci that the appraisal award under Coverage A had not accounted for asbestos remediation, which Hall described as a "hidden and unforeseen event/condition that was not exposed until demolition commenced." ECF No. 24-9 at 2. Given that the Coverage A amount had already been determined and paid, Bramucci directed Hall and Plaintiffs to take their requests to Amica's counsel. *See* ECF No. 24-8 at 2.

Amica promptly replied. The insurer noted that the appraisal award had not specifically accounted for asbestos *abatement*, only asbestos *testing*. ECF No. 24-11 at 4. But that was because the appraisal panel "did not deem it appropriate to include any asbestos remediation in the appraisal award." *Id.* Amica denied Plaintiffs' request to supplement the appraisal award under Coverage A for asbestos abatement. *Id.*

Plaintiffs moved for partial summary judgment on the issue of whether Amica should supplement the Coverage A appraisal award to cover the $12,000 cost of asbestos abatement. ECF No. 24; *see* ECF No. 24-1 at 5. Amica opposed that motion and cross-moved for summary judgment. ECF No. 25.

### C. The Appraisal Award for Coverage C–Personal Property

The cost of repairing or replacing Plaintiffs' personal property that was damaged during the fire turned out to be substantially more than the cost of repairing the home. On May 31, 2024, the panel issued its fourth and final award, an award for Coverage C–Personal Property, for $686,250, the policy limit. ECF No. 21-2 at 32 (noting the limits

of liability for the various coverages); ECF No. 21-4 at 2.[2] The panel affirmed that it had "investigated and considered all the material facts and available information pertaining to this claim." ECF No. 21-4 at 2. On June 21, 2024, Amica paid $482,142.51, which it calculated by offsetting the $686,250 coverage amount by $204,107.49. *See* ECF No. 21-5 at 2–3; ECF No. 22-8 at 2–3. That offset was based on Amica's payments to several companies that had cleaned various of Plaintiffs' personal property and then stored them for months—some for years. *See* ECF No. 21-12 at 2 (a September 2022 email from Amica's appraiser stating that Amica had paid storage costs since January 2020, the past 19 months); ECF No. 12-11 at 2 (an invoice for 18 months of storage from June 2022 to November 2023); *see also* ECF No. 22-7 at 2 (a payment for storage costs issued on December 16, 2019); *id.* at 18 (a payment for storage costs issued on February 16, 2024).

Plaintiffs complained that Amica should not have offset the Coverage C payment with those cleaning/storage costs. They argued that although those costs were for cleaning and storage of their personal property that was damaged during the fire, Amica should have paid those costs *on top* of the Coverage C policy limit because those payments were costs Amica chose to incur to attempt to repair the personal property instead of replacing it. *See* ECF No. 21-6 at 2–5. Plaintiffs eventually picked up their personal property and took the position that the cleaning had not been successful. *See id.* at 4. Plaintiffs claimed that Amica, rather than cleaning or repairing the personal

---

[2] The panel issued the second award on April 17, 2023, for Coverage D–Loss of Use. ECF No. 22-19 at 2. For loss of use, the panel set the replacement cost value and actual cash value at $266,534.65. The panel issued a third award on February 21, 2024, for Coverage C–Personal Property for Business Personal Property. That award was for $5,000, the maximum amount under the policy. ECF No. 22-5 at 2.

7

property, should have declared it unsalvageable and paid to replace it. *See id.* Based on the premise that the personal property was unsalvageable, Plaintiffs contended that the cost of *attempting* to clean it, and then the cost to store it while waiting for Plaintiffs to pick it up, should have been borne by Amica and not counted against Plaintiffs' Coverage C policy limit because they comprised costs of Amica's (allegedly failed) attempt to mitigate its payout. *See id.*

There are several aspects of the parties' dispute over this issue, including whether the personal property was in fact salvageable—*i.e.*, whether the cleaning was successful. But one set of facts is undisputed: Plaintiffs never properly allowed Amica to inspect the personal property to assess Plaintiffs' claim that it had been irreparably damaged. As discussed above, Plaintiffs assumed duties after the fire, such as the duty to "[c]ooperate with [Amica] in the investigation of a claim" and the duty to "[s]how the damaged property." ECF No. 24-12 at 49. Yet when Amica asked to inspect the personal property, Plaintiffs refused. *See* ECF No. 22-10 at 2–3. Instead, on May 6, 2020, when Plaintiffs and Amica met at the storage facility for Amica to inspect the property, Plaintiffs "informed [Amica] that the items had been cleaned and reboxed." *Id.* at 2. Amica, therefore, could not properly assess the damage to the property from the fire. *See id.* at 2–3 (notifying Plaintiffs, among other things, that "Amica was unable to verify that the contents would be able to be cleaned and salvaged"). Three years later, when Plaintiffs alleged that the personal property had *not* been successfully cleaned and instead was unsalvageable, Amica again requested to inspect it. *See* ECF No. 22-15 at 2. Plaintiffs again refused; their explanation for refusing was that the appraisal was underway and additional inspection would only delay a resolution. *Id.*

8

Finding Amica's offsets for storage and cleaning improper, Plaintiffs filed a motion requesting that the Court order Amica to pay the balance of the policy limits under Coverage C without any offset for the storage and cleaning costs. *See* ECF No. 21. Plaintiffs frame that request as a motion to enforce the appraisal award (although the appraisal itself did not address whether Amica was entitled to offset the storage and cleaning costs). *Id.*

\* \* \*

The parties' cross-motions for summary judgment, which focus on Coverage A, and Plaintiffs' motion challenging the cleaning/storage offset under Coverage C, are both fully briefed.

## II. Standard of Review

A party may move for summary judgment on any "claim or defense" by showing "there is no genuine dispute as to any material fact" and that the party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Tolan*, 572 U.S. at 656–67, and draws all reasonable inferences in its favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). This standard of review does not change where, as here, there are cross motions for summary judgment. *See Monumental Paving*, 176 F.3d at 797. The Court considers each motion separately under the Rule 56 standard. *Id.*

The summary judgment standard also applies to Plaintiffs' motion to enforce the appraisal award, which presents the dispute over Coverage C–Personal Property, because that motion relies on evidence outside the pleadings. *See Dist. 17, United Mine Workers of Am. v. Apogee Coal Co.*, 13 F.3d 134, 138 (4th Cir. 1993) ("[D]ue to the extremely limited nature of permissible judicial review, proceedings to enforce arbitration

9

awards . . . frequently will lend themselves to expeditious consideration . . . . resolved promptly on motions for summary judgment based on the record from the arbitration proceedings without the necessity of discovery."); *Est. of Ke v. Yu*, 105 F.4th 648, 655 (4th Cir. 2024) (stating that petitions to confirm arbitration agreements are "akin to a motion for summary judgment") (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 109 (2d Cir. 2006)); *cf.* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

## III.  Discussion

The pending motions pertain to two distinct disputes: whether Amica should be required to pay the additional $12,000 in asbestos abatement under Coverage A—Dwelling, and whether Amica was entitled to offset the cleaning and storage costs under Coverage C—Personal Property. The undisputed evidence entitles Amica to judgment as a matter of law on both issues.

### A.  Does Coverage A–Dwelling Cover Unforeseen Asbestos Remediation?

Because the appraisal award was a binding and final decision on the amount of the loss to Plaintiffs' home, Plaintiffs cannot now adjust the decision, regardless of the unforeseen asbestos remediation.

Courts interpret insurance policies like any other contract. *Hartford Fire Ins. Co. v. Himelfarb*, 736 A.2d 295, 300 (Md. 1999) (citing *Collier v. MD–Individual Practice Ass'n*, 607 A.2d 537, 539 (Md. 1992); *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985)). Here, the policy contains an appraisal clause, ECF No. 24-12 at 66, which the Court treats as an arbitration clause. *See Aetna Cas. & Sur. Co. v. Ins.*

10

*Comm'r*, 445 A.2d 14, 20 (Md. 1982) ("In Maryland, this Court has long recognized that, notwithstanding the distinctions between an appraisal under an insurance policy appraisal clause and arbitration, appraisal is analogous to arbitration. Consequently, this Court has applied arbitration law to appraisal clauses in insurance policies."). The Court's review of an arbitration award or, here, an appraisal award, "is substantially circumscribed." *Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th Cir. 2007) (quotation omitted). In fact, because "full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation"—the Court's review of an arbitration award "is among the narrowest known at law." *Id.* (quotation omitted); *see also Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188, 193 (4th Cir. 1998) (noting that substantive review of an arbitration award is limited to "the grounds listed in the Federal Arbitration Act, [9 U.S.C. § 10,] or if the arbitrator acted in manifest disregard of law"). The Court "determine[s] only whether the arbitrator did his job—not whether he did it well, correctly, or reasonably, but simply whether he did it." *Norfolk S. Ry. v. Sprint Commc'ns Co. L.P.*, 883 F.3d 417, 422 (4th Cir. 2018) (quotations omitted); *see* Md. Code, Cts. & Jud. Proc. § 3-224(b)(3) (providing limited grounds for vacating an arbitration award, including that "[t]he arbitrators exceeded their powers"). Further, an appraisal award is final if it resolves all issues presented to the appraisers. *See Norfolk S. Ry.*, 883 F.3d at 422 (citing *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 177 (2d. Cir. 1998)). Final awards are generally binding unless the appraisal clause says otherwise. *See Qorvis Commc'ns, LLC v. Wilson*, 549 F.3d 303, 307–09 (4th Cir. 2008).

The operative issue here is determining the scope of the appraisal award: whether the award covered all future expenses for the home's restoration or whether it was subject to amendment if unforeseen costs were to arise. To determine the award's scope, the Court looks to the policy's appraisal clause. *See State Auto. Mut. Ins. Co. v. Rod & Reel, Inc.*, Case No. 18-cv-0340-PWG, 2018 WL 5830734, at *6 (D. Md. Nov. 7, 2018), *aff'd*, 774 F. App'x 168 (4th Cir. 2019). That clause provides that "[i]f you [the insureds] and we [Amica] fail to agree on the amount of loss, either may demand an appraisal of the loss." ECF No. 24-12 at 66. As discussed, each party selects an appraiser. *Id*. The appraisers selected by the parties then select a third appraiser; the three appraisers then evaluate the loss independently and then "separately set the amount of loss." *See id*. "A decision agreed to by any two [members of the appraisal panel] will set the amount of loss." *Id*. Nothing in the appraisal clause suggests that appraisal awards are tentative or subject to revision. *See id*. Instead, the clause expressly states that the panel's decision "set[s] the amount of loss" under Coverage A, *see id*., thereby resolving all issues concerning Coverage A that were presented to the appraisers, *see Norfolk S. Ry.*, 883 F.3d at 422.

The fact that the policy provides that any appraisal is a *final* appraisal is echoed in the appraisal award that was issued here. *See* ECF No. 24-15 at 2. The parties' appraisers, Hall and Bramucci, agreed that the replacement cost value was $241,233.61 for the "Dwelling." *See id*. Nowhere did the award carve out a possibility of future claims. Instead, the appraisers agreed that the dollar figure they determined was the "whole amount[ of loss] before deductions." *Id*. The appraisers further attested that they had "conscientiously performed the duties assigned to [them]"—duties that included rendering an independent assessment of the replacement cost for the dwelling. *See id*.

12

Given the language of the policy, affirmed by the language of the appraisal award, the award for Coverage A–Dwelling was final and binding. *See Qorvis Commc'ns*, 549 F.3d at 307–09. It cannot now be amended.

Because the appraisal award was final, and because Plaintiffs allege neither grounds under the Federal Arbitration Act on which to upset the award, nor that the appraisers manifestly disregarded the law, Plaintiffs are not entitled to re-open the appraisal to seek an additional award to cover costs that turned out to be required for asbestos abatement. Accordingly, the Court will deny Plaintiffs' motion for partial summary judgment, ECF No. 24, and grant Amica's cross-motion for summary judgment, ECF No. 25, as to Coverage A–Dwelling.

### B. Can Amica Offset the Cleaning and Storage Expenses from the Personal Property Coverage?

In the event of a loss to personal property, the policy assigned duties to both Amica and the insureds. In the event of a covered event such as a fire, Amica had to pay the least of either the replacement cost or the repair cost of the damaged property. *See* ECF No. 24-12 at 80. Plaintiffs, for their part, had to, among other duties, cooperate with Amica's investigation, timely submit a proof of loss, make property available for Amica's inspection, and protect the property from further damage. *See id*. at 49. If Plaintiffs breached a duty in a way that prejudiced Amica, Amica had "no duty to provide coverage." ECF No. 24-12 at 49.

Depending upon a policy's language, duties may be either a condition precedent or a covenant. *See Himelfarb*, 736 A.2d at 300–01. A condition requires strict compliance: A plaintiff must fulfill its duty first; then, the insurer will fulfill its duty (*i.e.*, the duty to pay). *See id*. A covenant requires substantial (not strict) compliance. *See id*.

13

Substantial compliance means, for example, giving the insurer information that the insurer reasonably requests. *See id.* at 306; *accord Gehani v. Am. Zurich Ins. Co.*, 287 F. Supp. 3d 574, 579 (D. Md. 2017).

Assuming without deciding that the duties here are covenants rather than conditions—a lower bar—the undisputed record establishes that Plaintiffs did not substantially comply with their duty to cooperate, their duty to timely submit a proof of loss, or their duty to make property available for inspection. Those repeated failures prejudiced Amica in its investigation and evaluation of damages.

First, Plaintiffs attempted to repair their personal property without notifying Amica, despite Amica's multiple requests for documentation and an opportunity to inspect the property beforehand. *See* ECF No. 22-10 at 2. The undisputed evidence establishes that Plaintiffs' lack of cooperation undermined Amica's ability to inspect the fire damage to the personal property. Without proper inspection, Amica could not assess the loss or whether certain items were salvageable. Amica warned Plaintiffs of their breach but still paid the cost for cleaning the property. *See id.* at 2–3.

Second, Plaintiffs did not timely submit a proof of loss to Amica. *See* ECF No. 22-16 at 30–31 (extending the deadline—initially July 21, 2020—this time to December 31, 2020, despite Plaintiffs' repeated failure to respond); ECF No. 24-12 at 49 (requiring Plaintiffs to send Amica "within 60 days after [its] request" a "signed, sworn proof of loss" including various details about the damaged property). They not only failed to timely submit a proof of loss, but also did not ask for extensions—though Amica gave them anyway. *See* ECF No. 22-16 at 30–31. Indeed, for months, Plaintiffs did not respond to Amica's requests at all. *See id.* And when Plaintiffs eventually submitted their proof of loss, it lacked important details, namely the estimated total loss and a list of the

14

damaged personal property. *See* ECF No. 22-17 at 2 (claiming the whole loss and the amount claimed as "[y]et to be determined" more than a year after Amica requested a proof a loss). Amica rejected the proof of loss as inadequate and notified Plaintiffs of that rejection. *See* ECF No. 22-18 at 2–3.

Third, when Plaintiffs again raised the issue of possible contamination of their personal property, Amica offered to inspect it. *See* ECF No. 22-15 at 2–4. Yet Plaintiffs would not cooperate, claiming it was "improper for Amica to demand further inspections of personal property." *See id*. Not so. If Plaintiffs found their personal property unsalvageable, they had a contractual duty to make the property available to Amica for inspection.

Plaintiffs advance several other arguments related to cleaning and storage costs, but none rebuts the undisputed evidence of the above breaches on Plaintiffs' part. Plaintiffs argue, without evidence, that the attempt to clean the clothing and other personal property was unsuccessful, and that instead of attempting to clean the materials Amica should have replaced them. ECF No. 21-1 at 19–22. But, as mentioned, Amica presents undisputed facts showing that Plaintiffs rebuffed Amica's attempts to inspect their property, preventing Amica from assessing Plaintiffs' claim that the personal property was unsalvageable. Based on the information that Plaintiffs imperfectly presented, Amica chose to clean what it deemed salvageable, a choice within its rights as the insurer. *See* ECF No. 24-12 at 80 (stating that Amica would "pay no more than the least of" either "[r]eplacement cost at the time of loss" or "[t]he full cost of repair at the time of loss"). There is no genuine dispute of material fact on this issue; the undisputed evidence establishes that Plaintiffs' breaches of duties prejudiced Amica's investigation, and there is

15

no evidence (as opposed to allegations) that the repairs that Amica paid for were unsuccessful.

Next, Plaintiffs argue that they should not have to pay for storage of their cleaned personal property. ECF No. 21 at 21. But Plaintiffs had a duty to protect their property. Returning their cleaned property to a still-damaged house, under restoration, would have risked damaging the property again. And Plaintiffs do not contend that they picked up the property, offered to do so, or offered to find an alternative place to store their personal property until the home repairs were complete. Amica's duty to repair the personal property required storing it until it could be safely moved into Plaintiffs' restored home. Thus, storage costs are part of Coverage C–Personal Property, and Amica was entitled to count those costs toward Plaintiffs' Coverage C policy limits.

Lastly, Plaintiffs argue that cleaning and storage of personal property should fall under Coverage D–Loss of Use, and thus should not have been counted toward the policy limits under Coverage C. *See* ECF No. 21-1 at 19–20. Coverage D insures "any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living . . . . for the shortest time required to repair or replace the damage." *Id.* at 40. Coverage D is not the coverage pertinent to damage caused to personal property. Those costs were not "living expenses to maintain [a] normal standard of living" like temporary housing when insureds cannot sleep in their damaged home, *see, e.g.*, *Ling-Ming Pai v. Hartford Ins. Co. of Midwest*, No. 1669, Sept. Term (2016), 2018 WL 871519, at *1 (Md. Ct. Spec. App. Feb. 12, 2018), or increased meal costs if insureds' kitchen is too damaged for use, *see, e.g.*, *Exantus v. Metro. Prop. & Cas. Ins. Co.*, 582 F. Supp. 2d 239, 243 (D. Conn. 2008). Instead, as a matter of straightforward

16

contract interpretation, these costs fall under Coverage C–Personal Property, which insures "personal property owned or used by an insured." ECF No. 24-12 at 38.

In summary, the undisputed evidence establishes that Plaintiffs' breaches of their duties sufficiently prejudiced Amica's investigation such that Plaintiffs forfeited their claim for Amica to *replace* their personal property. Amica instead *repaired* Plaintiffs' personal property, upholding its end of the contractual bargain. Accordingly, the Court will deny Plaintiffs' motion to enforce the appraisal award and grant Amica's cross-motion for summary judgment as to Coverage C–Personal Property.

## IV. Conclusion

For the reasons stated, the Court will deny Plaintiffs' motion to enforce the appraisal award, ECF No. 21; deny Plaintiffs' motion for partial summary judgment, ECF No. 24; and grant Amica's cross-motion for summary judgment, ECF No. 25. A separate order follows.

August 4, 2025

/s/
_____
Adam B. Abelson
United States District Judge